UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Betty Ann Newby

vs.

President George Bush, et al.

Civil Action No. 05/877

FILED

OCT 0 6 2005

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

Plaintiff's Motion for
Reconsideration and for
an Altered or Amended Order

To the Honorable Judge Huvella:

Plaintiff Betty Ann Newby asks the Court pursuant to
Rule 59(e), FRCP, to reconsider her order to dismiss case
with prejudice and her finding that the defendants
have absolute immunity from suit and to reinstate
the case to the docket. Her Memorandum of Law is
attached.

Grounds for Relief

1. The court committed prejudicial error in holding
that the ~~defendants~~ are immune from suit
not entitling her to relief on any of her claims.
The error was sufficiently serious that it resulted
in the denial of a fair and final order on the merits.

2. The court committed prejudicial error in shifting
the burden of proof to plaintiff to prove she
had failed to state a claim for which relief
could be granted without first giving plaintiff
notice and an opportunity to present evidence in
support of her claims. The prejudicial error
denied Betty Ann Newby fundamental Due Process
because the court sua sponte dismissed the
case with prejudice a few hours after
plaintiff had filed it.

3. The court erred prejudicially in basing her
sua sponte order on the statutory language
of 28 U.S.C. § 1915(e)(2) contending that
plaintiff had failed to state a claim for
which relief could be granted and had sought

1.

monetary relief against a defendant who is immune
from such relief because 28 U.S.C. § 1915(e)(i)(iii)
applies to prisoners. Plaintiff is not a prisoner
and is entitled to Due Process protection in
seeking redress for wrongs done to her person and
property by federal actors

4. The court erred in failing to enter findings of fact
and conclusions of law to support her denial
of plaintiff's Motion for Temporary Restraining
Order as required by Rule 52, FRCP. Plaintiff
cannot prosecute her appeal effectively without
~~5.~~ such findings of fact and conclusions of law.

5. The court committed prejudicial error in failing
to enter a separate order regarding her
granting plaintiff's application to proceed
without prepayment of fees as required by the
rules for purposes of prosecuting her appeal.

6. The Court's findings that plaintiff had failed to
state a claim upon which relief could be
granted is contrary to the facts stated in
the complaint and in the motion for equitable
relief and works a manifest injustice
and an abuse of the court's discretion
not to vacate her Order of Dismissal and
reinstate the case to the docket. The wrong
findings and application of wrong law are prejudicial.

7. Newly discovered evidence establishes that
the findings and order in this matter are
erroneous. As the Declaration of Betty Ann
Newby makes clear, despite due diligence
in investigating this matter, by plaintiff,
it was only on October 3, 2005, after
entry of the dismissal order in this case,
that plaintiff discovered additional evidence
on certain of the defendants' motivations

in marginalizing plaintiff by destroying her property and damaging her reputation. The supporting Memorandum of Law explains how this evidence is relevant and persuasive on this issue, and not merely cumulative of or impeaching evidence already considered by the Court. Also, defendants continue to harm plaintiff and destroy her property and have intensified surveillance.

8. The court committed prejudicial error by applying a heightened scrutiny to plaintiffs pleadings alleging wrongs by federal actors, and the error denied plaintiff, indigent but a non-prisoner, Due Process.

9. The Court did not apprehend the facts set forth in the plaintiff's complaint and motion and manifest in injustice created by applying inapposite law to incorrect facts can be prevented only by the Court's granting this motion and reinstating the case to the docket, allowing plaintiff opportunity to amend her pleadings and present her evidence that she has stated claims upon which relief can be granted and has authority to seek money damages from the defendants.

10. Alternatively, the court's conduct demonstrated such a great lack of impartiality and disregard for plaintiff's Due Process that it unfairly and improperly prejudiced the result. The attached Declaration of Betty Ann Newby develops the facts supporting recusal for bias and impartiality; and the attached Memorandum of Law establishes that this conduct is sufficient to warrant vacating the Order of dismissal with prejudice.

11. The court erred in determining that plaintiff
has no claims against President Bush
in determining dismissal with prejudice
*sua sponte*. Plaintiff challenges the
Constitutionality of the Executive Orders
No. 12,667 and 13,233 on Separation of
Powers and Supremacy Clause grounds.
The President cannot decide the right
of judicial review of Executive Orders
nor can he extend the protection to
Vice-Presidents' papers or the dates
upon which occurrence the public
is entitled to access to the
Presidential papers after a President leaves office.

12. The plaintiff challenges the
Constitutional validity of
President Bush's claims that
deliberative privilege prevails
over plaintiff's and the Senate's
and the public's right to know
the philosophy and ethics of
a candidate for judicial
office on separation of
Powers and Supremacy Clause
grounds. She will likely prevail on the merits.

13. The plaintiff challenges the
extent and outer perimeters of Bush's interpretation
of executive privilege regarding
documents in the Office of the
Executive and the Executive
branch and contends that the her
and the public's right to know
how government operates
balances in their favor over
claims by the executive branch,
conditioned that procedural
safeguards by the courts
are followed to protect valid
executive interests and litigants.

14. Plaintiff challenges the federal government's covert surveillance of her and its agents' destruction of her properties, including her reputation, to punish her for aggressive litigation against Phillips Petroleum Co.[1] the Whittenburg heirs, the Johnson heirs, Locke-Liddell & Sapp. LLP, and the City of Borger, Texas for the forced relocation of residential Phillips, Texas due to hazardous chemical exposure from Phillips' facilities located on land formerly owned by the Johnsons and Whittenburgs. The Dallas lawyers and Phillips' in-house counsel (Tim Mountz, Mike Powell, Tom Cubbage, Jerry Miller, Joe Cochran, Susan Edwards, and Cliff Creighton) shredded and burned truckloads of protected environmental documents during that litigation. George Whittenburg, III., Esq. bribed the Hon. Mary Lou Robinson and plaintiff's co-counsel; and the Locke-Purnell-Rain-Harrell, P.C. and Phillips' corporate counsel suborned perjury, lied to residential Phillips, and engaged in illegal surveillance of plaintiff and her client during the Phillips cases.

The CERCLA response costs are approximately one billion dollars owed to the residents forced to move.

Federal actors participated in destruction of plaintiff's home and car, two historic properties, and George Newby Jr's Estate's property while surveilling plaintiff for the petro-chemical giants — Phillips, Exxon-Mobil-Chevron-Conoco and others.

Vice-President Cheney's son-in-law was just named by President Bush in 2005 to serve as General Counsel for the Department of Homeland Security. Homeland Security oversees Home Guard Security.

The federal agents and local agents destroy properties, burglarize; autos, homes, and offices for Homeguard Security network, with approval of government lawyers in the executive branch. Plaintiff has been surveilled one level lower than Bin Laden because of the wrongful classification of her by the executive in 1990.

---

[1] — Phillips Pet. Co. has now merged with Chevron and Conoco.

(5)

15   The court committed prejudicial error in finding that plaintiff stated no claims against President Bush or Judge John Roberts and sought claims for money damages from a defendant (sic) who is immune from such relief. The error was sufficiently serious that it resulted in the denial of a fair and final order on the merits.

16.   Plaintiff challenges the
Constitutionality of the
notice provision in the
Federal Tort Claims Act
because it denies her
Due Process in seeking
immediate, equitable
relief in situations like
the present case in which
the 60-day waiting ~~time~~ period
would have effectively ~~cut~~
allowed the confirmation
proceeding to conclude
without equitable orders
and resolution of her
Constitutional challenge to
the lack of Constitutional
safeguards for plaintiff, a
D.C. resident, and the failure of
the Judicial Committee to
compel production of Roberts'
papers, compel ~~testimony~~, and
challenge President Bush's
marrow interpretation of ~~the~~
executive and deliberative privilege,
and his attempting to violate the
Separation of Powers-Supremacy
Clause doctrine by limiting judicial
review and his legislating the
terms of Executive Order No. 13,233.

~~The existence of the~~

17. Alternatively, if 28 USC §1915 is determined to be applicable to non-prisoners who are indigent, then plaintiff contends she is denied Due Process and equal treatment as an American if her financial ability and pro se status allow the federal courts to deny her procedural safeguards accorded to fee-paying litigants represented by counsel by allowing the district court to dismiss with prejudice sua sponte without notice, and an opportunity to amend her pleadings, if necessary, and present evidence at a hearing in a meaningful time and manner.

18. The court committed prejudicial error in failing to apply a presumption of truthfulness to plaintiff's facts contained in her pleadings and construing them favorably for plaintiff.

19. The court committed prejudicial error in applying incorrect law to the facts of this case because plaintiff pled for the issuance of a temporary injunction and immediate ~~declarative~~ protection of relevant evidence and not just a temporary restraining order as the Order states.

## Supporting Record

This motion is based on the attached Declaration of Betty Ann Newby, Executive Orders Nos. 12667 and 13233 Oath of office forms for government employees and the President, Washington post article dated October 4, 2005;

Washington Post article dated October 5, 2005; envelope from District Clerk's office that contained September 22, 2005, order; United States Senate Committee on the Judiciary; Plaintiff's Complaint and Request for Equitable and Declaratory Relief and Damages; plaintiff's Motion for Authority for a Temporary Injunction, and plaintiff's Application to Proceed without Prepayments of fees and affidavit; and Certificate of Service; and supporting Memorandum of law.

Respectfully submitted,

Betty Ann Newby
425 2d St NW
Washington, D.C. 20090
no phone

(8)

Certificate of Service

I, Betty Newby certify that I am unable to pay for copies of this pleading to serve on the defendants because of my poverty on 10-6-2005. I ask the Court to pay for the copies in the interest of justice. Betty Newby

<u>Appendix</u>          CA 05-1877

1. Declaration of Betty Ann Newby  — A
2. Executive Order # 12667         — B
3. Executive Order # 13233         ~  C
4. Oaths of President
   and federal employees           — E
5. <u>Washington Post</u> Miers
   article  Oct. 4, 2005           — F
6. <u>Washington Post</u>  Miers
   article  Oct 5, 2005            — G
7. Rules of Procedure
   United States Senate            — H
8. Envelope from Clerks
   office containing order
   and Memorandum                  — I

CA 051877

Declaration of
Betty Ann
Newby

1. "My name is Betty Ann Newby and I am the plaintiff and movant. I am competent to make this Declaration.

2. Phillips Petroleum Company operates the world's largest inland facility for hazardous chemicals and solvent production, manufacturing, and distribution near Borger, Texas. Its public relations program includes publications to its "corporate family" bragging on its commercial successes.

3. I have read numerous articles from Phillips Pet. Co. to its employees telling how the company's executives are on a first name basis with most American presidents. It loaned an engineer for the Manhattan Project and provided fuel and chemicals to the Department of Defense.

4. Conoco and Chevron recently merged with Phillips Pet. Co. several years ago because of the latter's refineries, its valuable concession globally, its political connections, and its patent to use the sulphur from sour Arab crude oil to make H2S to use as feedstock for its chemical operations. Phillips' trade in pesticides, pharmaceuticals, solvents, paints and plastics is more lucrative than the refinery products.

5. Harriet Miers former firm has represented Phillips and other energy giants for years. The facts stated in the accompanying Memorandum of Law are true and correct and based on personal knowledge.

6. I had prepared earlier pleadings in this matter last week. A resident at the federal shelter when I live now bragged that he placed my grocery cart in the trash compactor, along with my typewriter, and also books and notes last Friday when I was gone. I cannot buy another typewriter at this time.

7. The information regarding Harriet Miers and her personal" 051877

⑪

A hat Roman.    EX A

relationship with Nathan Hecht is recounted in the
Washington Post articles dated Oct. 4 and 5, 2005.
They are true copies.

The Senate Judiciary committee rules are true copies.
The oaths of office in the appendix are true copies.
The Executive Orders 12,667 and 13,233 are
true copies. I obtained these from a law
library.
In the late 1980's,
Nathan Hecht told a Borger audience not to waste
their money on legislators if they needed person
legislation. He advised the audience to use the
same time and money on any 5 of the Supreme
Court of Texas justices and they could get the
same result. I was in the audience. He was a
lawyer with the predecessor firm of Locke-Purnell
before becoming a state judge. He is a Justice on the
Texas Supreme Court.

Nathan Hecht instructed the Clerk not to
circulate my appeal motions to the Court because he
would dismiss my appeal, making the
motion for a complete record moot. His actions
made my suspension from the Bar a final order.

Former government employee told me about
Iraqui-surveillance and another employee
told me about Home guard Security and that
the government had bumped my classification
up to "K-DOG-3" by the spring of 2004.
He said I had been classified since 1990
and the surveillance had cost the federal
government millions of dollars. He told me
that over 250 other Texans alone were also
being likewise surveilled by state militia
home guards (retired military) and federal
special services. The group includes lawyers,
politicians, judges, academics, etc. who
are independent or liberal. It is operating
all over the U.S. and abroad."

③

"I ask the court in the interest of
justice and based on valid legal
precedents, to reconsider and
vacate its order of 9-22-2005
and reinstate my suit on the docket."
I make this Declaration under the
pains and penalties of perjury on
Oct. 6, 2005        Betty Nunley
in Washington, D.C."

③

**Mrs. Reagan.** Elaine said I should say something. But I'll never get through it. See? [*Laughter*]

Thank you.

**The President.** I think the band was going to play something. And it——

[*At this point, the U.S. Marine Corps Band played "Auld Lang Syne."*]

**The President.** Thank you all.

*Note: Kenneth M. Duberstein, Chief of Staff to the President, spoke at 3:30 p.m. in the East Room at the White House. Elaine D. Crispen is Press Secretary to the First Lady. The staff presented the President with a bridle and riding gear. In his closing remarks, Mr. Duberstein referred to Rex, the President and Mrs. Reagan's dog.*

## Executive Order 12667—Presidential Records

### January 18, 1989

By virtue of the authority vested in me as President by the Constitution and laws of the United States of America, and in order to establish policies and procedures governing the assertion of Executive privilege by incumbent and former Presidents in connection with the release of Presidential records by the National Archives and Records Administration pursuant to the Presidential Records Act of 1978, it is hereby ordered as follows:

**Section 1. Definitions.** For purposes of this Order:

(a) "Archivist" refers to the Archivist of the United States or his designee.

(b) "NARA" refers to the National Archives and Records Administration.

(c) "Presidential Records Act" refers to the Presidential Records Act of 1978 (Pub. L. No. 95–591, 92 Stat. 2523–27, as amended by Pub. L. No. 98–497, 98 Stat. 2287), codified at 44 U.S.C. 2201–2207.

(d) "NARA regulations" refers to the NARA regulations implementing the Presidential Records Act. 53 Fed. Reg. 50404 (1988), codified at 36 C.F.R. Part 1270.

(e) "Presidential records" refers to those documentary materials maintained by

NARA pursuant to the Presidential Records Act and the NARA regulations.

(f) "Former President" refers to the former President during whose term or terms of office particular Presidential records were created.

(g) A "substantial question of Executive privilege" exists if NARA's disclosure of Presidential records might impair the national security (including the conduct of foreign relations), law enforcement, or the deliberative processes of the Executive branch.

(h) A "final court order" is a court order from which no appeal may be taken.

**Sec. 2. Notice of Intent to Disclose Presidential Records.**

(a) When the Archivist provides notice to the incumbent and former Presidents of his intent to disclose Presidential records pursuant to section 1270.46 of the NARA regulations, the Archivist, utilizing any guidelines provided by the incumbent and former Presidents, shall identify any specific materials, the disclosure of which he believes may raise a substantial question of Executive privilege. However, nothing in this Order is intended to affect the right of the incumbent or former Presidents to invoke Executive privilege with respect to materials not identified by the Archivist. Copies of the notice for the incumbent President shall be delivered to the President (through the Counsel to the President) and the Attorney General (through the Assistant Attorney General for the Office of Legal Counsel). The copy of the notice for the former President shall be delivered to the former President or his designated representative.

(b) Upon the passage of 30 days after receipt by the incumbent and former Presidents of a notice of intent to disclose Presidential records, the Archivist may disclose the records covered by the notice, unless during that time period the Archivist has received a claim of Executive privilege by the incumbent or former President or the Archivist has been instructed by the incumbent President or his designee to extend the time period. If a shorter time period is required under the circumstances set forth in section 1270.44 of the NARA regulations, the Archivist shall so indicate in the notice.

**Sec. 3. Claim of Exec[utive privilege by] Incumbent President.**

(a) Upon receipt of a n[otice of intent to] disclose Presidential reco[rds, the Counsel] General (directly or thro[ugh] Attorney General for the [Office of Legal] Counsel) and the Counsel [to the President] shall review as they deem [appropriate the] records covered by the not[ice. After consulting] with each other, the Att[orney General and] other Federal agencies as [they deem appro-]priate concerning wheth[er invocation of] Executive privilege is justi[fied]

(b) The Attorney Gener[al and the Coun-]sel to the President, in the [exercise of their] discretion and after appro[priate review and] consultation under subsec[tion (a) of this sec-]tion, may jointly determin[e that invocation] of Executive privilege is [justified. The] Archivist shall be prompt[ly notified of] such determination.

(c) If after appropriate r[eview or consul-]tation under subsection ([a) of this section,] either the Attorney Gene[ral or the Counsel] to the President believes [that the circum-]stances justify invocation [of Executive privi-]lege, the issue shall be [presented to the] President by the Counsel [to the President] and the Attorney General.

(d) If the President dec[ides to invoke Ex-]ecutive privilege, the Cou[nsel to the Presi-]dent shall notify the form[er President, the] Archivist, and the Attorne[y General in writ-]ing of the claim of privileg[e and the specific] Presidential records to [which it relates.] After receiving such noti[fication, the Archivist] shall not disclose the p[rivileged records] unless directed to do so [by an incumbent] President or by a final cou[rt order.]

**Sec. 4. Claim of Exec[utive Privilege by] Former President.**

(a) Upon receipt of a c[laim of Executive] privilege by a former Pre[sident, the Archi-]vist shall consult with the [Attorney General] (through the Assistant Att[orney General for] the Office of Legal Couns[el), the Counsel to] the President, and such ot[her Federal agen-]cies as he deems appro[priate. In making] the Archivist's determina[tion whether] to honor the former Pr[esident's claim of] privilege or instead to dis[close the Presiden-]tial records notwithstan[ding the claim of] privilege. Any determina[tion under section] 3 of this Order that E[xecutive privilege] shall not be invoked b[y]

Mot Recon.
EX B
05 1877

*Sec. 3. Claim of Executive Privilege by Incumbent President.*

(a) Upon receipt of a notice of intent to disclose Presidential records, the Attorney General (directly or through the Assistant Attorney General for the Office of Legal Counsel) and the Counsel to the President shall review as they deem appropriate the records covered by the notice and consult with each other, the Archivist, and such other Federal agencies as they deem appropriate concerning whether invocation of Executive privilege is justified.

(b) The Attorney General and the Counsel to the President, in the exercise of their discretion and after appropriate review and consultation under subsection (a) of this section, may jointly determine that invocation of Executive privilege is not justified. The Archivist shall be promptly notified of any such determination.

(c) If after appropriate review and consultation under subsection (a) of this section, either the Attorney General or the Counsel to the President believes that the circumstances justify invocation of Executive privilege, the issue shall be presented to the President by the Counsel to the President and the Attorney General.

(d) If the President decides to invoke Executive privilege, the Counsel to the President shall notify the former President, the Archivist, and the Attorney General in writing of the claim of privilege and the specific Presidential records to which it relates. After receiving such notice, the Archivist shall not disclose the privileged records unless directed to do so by an incumbent President or by a final court order.

*Sec. 4. Claim of Executive Privilege by Former President.*

(a) Upon receipt of a claim of Executive privilege by a former President, the Archivist shall consult with the Attorney General (through the Assistant Attorney General for the Office of Legal Counsel), the Counsel to the President, and such other Federal agencies as he deems appropriate concerning the Archivist's determination as to whether to honor the former President's claim of privilege or instead to disclose the Presidential records notwithstanding the claim of privilege. Any determination under section 3 of this Order that Executive privilege shall not be invoked by the incumbent President shall not prejudice the Archivist's determination with respect to the former President's claim of privilege.

(b) In making the determination referred to in subsection (a) of this section, the Archivist shall abide by any instructions given him by the incumbent President or his designee unless otherwise directed by a final court order. The Archivist shall notify the incumbent and former Presidents of his determination at least 30 days prior to disclosure of the Presidential records, unless a shorter time period is required in the circumstances set forth in section 1270.44 of the NARA regulations. Copies of the notice for the incumbent President shall be delivered to the President (through the Counsel to the President) and the Attorney General (through the Assistant Attorney General for the Office of Legal Counsel). The copy of the notice for the former President shall be delivered to the former President or his designated representative.

*Sec. 5. Judicial Review.* This Order is intended only to improve the internal management of the Executive branch and is not intended to create any right or benefit, substantive or procedural, enforceable at law by a party against the United States, its agencies, its officers, or any person.

**Ronald Reagan**

The White House,
January 18, 1989.

*[Filed with the Office of the Federal Register, 11:07 a.m., January 19, 1989]*

## Proclamation 5935—National Day of Excellence, 1989
*January 18, 1989*

*By the President of the United States of America*

*A Proclamation*

On this third anniversary of the Space Shuttle Challenger's tragic accident, the lines of Tennyson in his poem "Ulysses" seem most appropriate:

Come, my friends;

56025

Federal Register

Vol. 66. No. 214

Monday, November 5, 2001

## Presidential Documents

Title 3—

The President

**Executive Order 13233 of November 1, 2001**

## Further Implementation of the Presidential Records Act

By the authority vested in me as President by the Constitution and the laws of the United States of America, and in order to establish policies and procedures implementing section 2204 of title 44 of the United States Code with respect to constitutionally based privileges, including those that apply to Presidential records reflecting military, diplomatic, or national security secrets, Presidential communications, legal advice, legal work, or the deliberative processes of the President and the President's advisors, and to do so in a manner consistent with the Supreme Court's decisions in *Nixon v. Administrator of General Services*, 433 U.S. 425 (1977), and other cases, it is hereby ordered as follows:

**Section 1.** *Definitions.*

For purposes of this order:

(a) "Archivist" refers to the Archivist of the United States or his designee.

(b) "Presidential records" refers to those documentary materials maintained by the National Archives and Records Administration pursuant to the Presidential Records Act, 44 U.S.C. 2201-2207.

(c) "Former President" refers to the former President during whose term or terms of office particular Presidential records were created.

**Sec. 2.** *Constitutional and Legal Background.*

(a) For a period not to exceed 12 years after the conclusion of a Presidency, the Archivist administers records in accordance with the limitations on access imposed by section 2204 of title 44. After expiration of that period, section 2204(c) of title 44 directs that the Archivist administer Presidential records in accordance with section 552 of title 5, the Freedom of Information Act, including by withholding, as appropriate, records subject to exemptions (b)(1), (b)(2), (b)(3), (b)(4), (b)(6), (b)(7), (b)(8), and (b)(9) of section 552. Section 2204(c)(1) of title 44 provides that exemption (b)(5) of section 552 is not available to the Archivist as a basis for withholding records, but section 2204(c)(2) recognizes that the former President or the incumbent President may assert any constitutionally based privileges, including those ordinarily encompassed within exemption (b)(5) of section 552. The President's constitutionally based privileges subsume privileges for records that reflect: military, diplomatic, or national security secrets (the state secrets privilege); communications of the President or his advisors (the presidential communications privilege); legal advice or legal work (the attorney-client or attorney work product privileges); and the deliberative processes of the President or his advisors (the deliberative process privilege).

(b) In *Nixon v. Administrator of General Services*, the Supreme Court set forth the constitutional basis for the President's privileges for confidential communications: "Unless [the President] can give his advisers some assurance of confidentiality, a President could not expect to receive the full and frank submissions of facts and opinions upon which effective discharge of his duties depends." 433 U.S. at 448-49. The Court cited the precedent of the Constitutional Convention, the records of which were "sealed for more than 30 years after the Convention." *Id.* at 447 n.11. Based on those precedents and principles, the Court ruled that constitutionally based privileges available to a President "survive[] the individual President's tenure." *Id.* at 449. The Court also held that a former President, although no longer

a Government official, may assert constitutionally based privileges with respect to his Administration's Presidential records, and expressly rejected the argument that "only an incumbent President can assert the privilege of the Presidency." *Id.* at 448.

(c) The Supreme Court has held that a party seeking to overcome the constitutionally based privileges that apply to Presidential records must establish at least a "demonstrated, specific need" for particular records, a standard that turns on the nature of the proceeding and the importance of the information to that proceeding. See *United States v. Nixon,* 418 U.S. 683, 713 (1974). Notwithstanding the constitutionally based privileges that apply to Presidential records, many former Presidents have authorized access, after what they considered an appropriate period of repose, to those records or categories of records (including otherwise privileged records) to which the former Presidents or their representatives in their discretion decided to authorize access. See *Nixon v. Administrator of General Services,* 433 U.S. at 450-51.

**Sec. 3.** *Procedure for Administering Privileged Presidential Records.*

Consistent with the requirements of the Constitution and the Presidential Records Act, the Archivist shall administer Presidential records under section 2204(c) of title 44 in the following manner:

(a) At an appropriate time after the Archivist receives a request for access to Presidential records under section 2204(c)(1), the Archivist shall provide notice to the former President and the incumbent President and, as soon as practicable, shall provide the former President and the incumbent President copies of any records that the former President and the incumbent President request to review.

(b) After receiving the records he requests, the former President shall review those records as expeditiously as possible, and for no longer than 90 days for requests that are not unduly burdensome. The Archivist shall not permit access to the records by a requester during this period of review or when requested by the former President to extend the time for review.

(c) After review of the records in question, or of any other potentially privileged records reviewed by the former President, the former President shall indicate to the Archivist whether the former President requests withholding of or authorizes access to any privileged records.

(d) Concurrent with or after the former President's review of the records, the incumbent President or his designee may also review the records in question, or may utilize whatever other procedures the incumbent President deems appropriate to decide whether to concur in the former President's decision to request withholding of or authorize access to the records.

(1) When the former President has requested withholding of the records:

(i) If under the standard set forth in section 4 below, the incumbent President concurs in the former President's decision to request withholding of records as privileged, the incumbent President shall so inform the former President and the Archivist. The Archivist shall not permit access to those records by a requester unless and until the incumbent President advises the Archivist that the former President and the incumbent President agree to authorize access to the records or until so ordered by a final and nonappealable court order.



    (ii)  If under the standard set forth in section 4 below, the incumbent President does not concur in the former President's decision to request withholding of the records as privileged, the incumbent President shall so inform the former President and the Archivist. Because the former President independently retains the right to assert constitutionally based privileges, the Archivist shall not permit access to the records by a requester unless and until the incumbent President advises the Archivist that the former President and the incumbent President agree to authorize access to the records or until so ordered by a final and nonappealable court order.

  (2) When the former President has authorized access to the records:

    (i)  If under the standard set forth in section 4 below, the incumbent President concurs in the former President's decision to authorize access to the records, the Archivist shall permit access to the records by the requester.

    (ii)  If under the standard set forth in section 4 below, the incumbent President does not concur in the former President's decision to authorize access to the records, the incumbent President may independently order the Archivist to withhold privileged records. In that instance, the Archivist shall not permit access to the records by a requester unless and until the incumbent President advises the Archivist that the former President and the incumbent President agree to authorize access to the records or until so ordered by a final and nonappealable court order.

**Sec. 4.** *Concurrence by Incumbent President.*

Absent compelling circumstances, the incumbent President will concur in the privilege decision of the former President in response to a request for access under section 2204(c)(1). When the incumbent President concurs in the decision of the former President to request withholding of records within the scope of a constitutionally based privilege, the incumbent President will support that privilege claim in any forum in which the privilege claim is challenged.

**Sec. 5.** *Incumbent President's Right to Obtain Access.*

This order does not expand or limit the incumbent President's right to obtain access to the records of a former President pursuant to section 2205(2)(B).

**Sec. 6.** *Right of Congress and Courts to Obtain Access.*

This order does not expand or limit the rights of a court, House of Congress, or authorized committee or subcommittee of Congress to obtain access to the records of a former President pursuant to section 2205(2)(A) or section 2205(2)(C). With respect to such requests, the former President shall review the records in question and, within 21 days of receiving notice from the Archivist, indicate to the Archivist his decision with respect to any privilege. The incumbent President shall indicate his decision with respect to any privilege within 21 days after the former President has indicated his decision. Those periods may be extended by the former President or the incumbent President for requests that are burdensome. The Archivist shall not permit access to the records unless and until the incumbent President advises the Archivist that the former President and the incumbent President agree to authorize access to the records or until so ordered by a final and nonappealable court order.

**Sec. 7.** *No Effect on Right to Withhold Records.*

This order does not limit the former President's or the incumbent President's right to withhold records on any ground supplied by the Constitution, statute, or regulation.

**Sec. 8.** *Withholding of Privileged Records During 12-Year Period.*

In the period not to exceed 12 years after the conclusion of a Presidency during which section 2204(a) and section 2204(b) of title 44 apply, a former President or the incumbent President may request withholding of any privileged records not already protected from disclosure under section 2204. If the former President or the incumbent President so requests, the Archivist shall not permit access to any such privileged records unless and until the incumbent President advises the Archivist that the former President and the incumbent President agree to authorize access to the records or until so ordered by a final and nonappealable court order.

**Sec. 9.** *Establishment of Procedures.*

This order is not intended to indicate whether and under what circumstances a former President should assert or waive any privilege. The order is intended to establish procedures for former and incumbent Presidents to make privilege determinations.

**Sec. 10.** *Designation of Representative.*

The former President may designate a representative (or series or group of alternative representatives, as the former President in his discretion may determine) to act on his behalf for purposes of the Presidential Records Act and this order. Upon the death or disability of a former President, the former President's designated representative shall act on his behalf for purposes of the Act and this order, including with respect to the assertion of constitutionally based privileges. In the absence of any designated representative after the former President's death or disability, the family of the former President may designate a representative (or series or group of alternative representatives, as they in their discre tion may determine) to act on the former President's behalf for purposes of the Act and this order, including with respect to the assertion of constitutionally based privileges.

**Sec. 11.** *Vice Presidential Records.*

(a) Pursuant to section 2207 of title 44 of the United States Code, the Presidential Records Act applies to the executive records of the Vice President. Subject to subsections (b) and (c), this order shall also apply with respect to any such records that are subject to any constitutionally based privilege that the former Vice President may be entitled to invoke, but in the administration of this order with respect to such records, references in this order to a former President shall be deemed also to be references to the relevant former Vice President.

(b) Subsection (a) shall not be deemed to authorize a Vice President or former Vice President to invoke any constitutional privilege of a President or former President except as authorized by that President or former President.

(c) Nothing in this section shall be construed to grant, limit, or otherwise affect any privilege of a President, Vice President, former President, or former Vice President.

**Sec. 12.** *Judicial Review.*

This order is intended to improve the internal management of the executive branch and is not intended to create any right or benefit, substantive or procedural, enforceable at law by a party, other than a former President or his designated representative, against the United States, its agencies, its officers, or any person.

Federal Reg... .er ...ol. 66, No. 214 / Monday, November 5, 2001 / Presidential Documents    56029

**Sec. 13.** *Revocation.*

Executive Order 12667 of January 18, 1989, is revoked.

THE WHITE HOUSE,
*November 1, 2001.*

[FR Doc. 01–27917
Filed 11–2–01: 11:23 am]
Billing code 3195–01–P



# US Code collection



collection home      faq      search      donate

**TITLE 5 > PART III > Subpart B > CHAPTER 33 > SUBCHAPTER II > § 3331**

Prev | Next

## § 3331. Oath of office

*Release date: 2005-05-18*

An individual, except the President, elected or appointed to an office of honor or profit in the civil service or uniformed services, shall take the following oath: "I, AB, do solemnly swear (or affirm) that I will support and defend the Constitution of the United States against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; that I take this obligation freely, without any mental reservation or purpose of evasion; and that I will well and faithfully discharge the duties of the office on which I am about to enter. So help me God." This section does not affect other oaths required by law.

*Search this title:*

Search Title 5

Notes
Updates
Parallel authorities
(CFR)
Your comments

Prev | Next

*LII has no control over and does not endorse any external Internet site that contains links to or references LII.*

credits      about us      send email

Oaths of Pres
05 1877    EX E

Not Rern    10/1/2005 3:08 PM

Strong Grounding in the Church Could Be a Clue to Miers's Priorities    Page 1 of 3

washingtonpost.com

# Strong Grounding in the Church Could Be a Clue to Miers's Priorities

By Michael Grunwald, Jo Becker and John Pomfret
Washington Post Staff Writers
Wednesday, October 5, 2005; A01

One evening in the 1980s, several years after Harriet Miers dedicated her life to Jesus Christ, she attended a lecture at her Dallas evangelical church with Nathan Hecht, a colleague at her law firm and her on-again, off-again boyfriend. The speaker was Paul Brand, a surgeon and the author of "Fearfully and Wonderfully Made," a best-selling exploration of God and the human body.



When the lecture was over, Miers said words Hecht had never heard from her before. "I'm convinced that life begins at conception," Hecht recalled her saying. According to Hecht, now a Texas Supreme Court justice, Miers has believed ever since that abortion is "taking a life."

"I know she is pro-life," said Hecht, one of the most conservative judges in Texas. "She thinks that after conception, it's not a balancing act -- or if it is, it's a balancing of two equal lives."

Hecht and other confidants of Miers all pledge that if the Senate confirms her nomination to the Supreme Court, her judicial values will be guided by the law and the Constitution. But they say her personal values have been shaped by her abiding faith in Jesus, and by her membership in the massive red-brick Valley View Christian Church, where she was baptized as an adult, served on the missions committee and taught religious classes. At Valley View, pastors preach that abortion is murder, that the Bible is the literal word of God and that homosexuality is a sin -- although they also preach that God loves everybody.

White House spokeswoman Dana Perino declined to comment on Hecht's recollection yesterday but said President Bush did not ask Miers her personal views on abortion or any other issue that may come before the court. "A nominee who shares the president's approach of judicial restraint would not allow personal views to affect his or her rulings based on the law," Perino said.

Some religious conservatives have expressed deep dissatisfaction with the Miers nomination, grumbling that she has never taken public stands on hot-button social issues. But her friends point to Valley View as evidence that she is cut from conservative cloth. They say she's not a "holy roller" who flaunts her religion on her sleeve but she lives her faith as a born-again Christian.

"People in Dallas know she's a conservative," said her friend Ed Kinkeade, a federal district judge. "She's not Elmer Gantry, but she lives what she believes. . . . I'm like, y'all, has George Bush appointed anyone to an appellate court that is a betrayal to conservatives?"

Even in Dallas, home of groups such as the Texas Eagle Forum and the Republican National Coalition for Life, some religious conservatives say Miers, 60, has demonstrated an insufficient commitment to family values. They cited a questionnaire she filled out for a gay rights group in 1989 as a candidate for Dallas City Council, indicating that gay people should have the same civil rights as straight people and that the city should fund AIDS education and services. After her election, she appointed an openly gay lawyer to an influential city board.

"For goodness' sake, why elevate AIDS over cancer? She shouldn't have filled out that questionnaire at all," said Cathie Adams, president of the Texas Eagle Forum. "President Bush is asking us to have faith in things unseen. We only have that kind of faith in God."

051877    By F    10/6/2005

But on the same questionnaire, Miers opposed the repeal of a Texas anti-sodomy law and said she was not seeking the endorsement of the gay rights group. In a meeting with the group, she said that her "personal conviction is not consistent" with the "homosexual lifestyle," according to one activist's notes.

Hecht suggested that it would be difficult to attend Valley View regularly and support gay rights. At the same time, he said, Miers's faith made her more sympathetic to the struggles of others, and her duties as an at-large City Council member transcended her personal views.

"She represented those people, and she wanted to represent the whole city," Hecht said. "It doesn't mean that you approve of their lifestyle."

Hecht remembers that when Miers made partner at their law firm, the first woman ever to do so, she began to question what life was all about. He said they would often put their feet up and trade Big Questions: Is there a God? Who is He? What difference does it make? Miers had attended Episcopalian and Presbyterian churches as a girl, and her mother was religious, but Miers told Hecht she wanted a "deeper faith." Hecht believes she may have supported abortion rights at the time, although he said she had not thought about it much.

"Well, let's go to my church," Hecht told her.

That was Valley View, where Hecht played the organ and taught Sunday school. It was a church, pastor Ron Key said, that believed in "the Judeo-Christian perspective on the sanctity of life" and "the Christian perspective on marriage." There are antiabortion pamphlets inside the church and literature opposing premarital sex. Key and his wife, Kaycia, said they never asked Miers what she thought about those issues, because they never thought they had to.

"We've known Harriet for 30 years and we've never had any reason to discuss these hot topics," Kaycia Key said. "But I can say one thing: She's a totally committed Christian."

But some antiabortion activists noted that Justice Anthony M. Kennedy was described as a devout Catholic when he was nominated by President Ronald Reagan -- and he still voted to uphold *Roe v. Wade* . Miers donated $150 at a fundraising dinner for a Texas antiabortion group in 1989, but Colleen Parro, director of the Republican National Coalition for Life, remembers that there were plenty of politicians trolling for votes at the dinner. Parro said she does not care whether Miers is a born-again Christian, or the companion of Hecht.

"It's not about her church, or the fellow she dates. It's about her record," Parro said. "She seems like a fine lady, but this nomination does not advance the culture of life."

In 1993, when Miers was the president of the Texas bar, she led a challenge to the American Bar Association's support for abortion rights. Some of her friends say she just thought it was inappropriate for the group to take a stand on a moral issue, but others point out that an abortion rights supporter probably would not have challenged the status quo.

"She didn't have to do that," Kinkeade said. "She was following her beliefs."

Those beliefs were forged at Valley View, but Miers is breaking away from the church where she embraced Jesus. In recent years, church elders have moved to cut back on missionary work, sparking a split this summer among the parishioners. Key is forming a church that plans to donate half its revenues to mission work, and Miers plans to join him.

"These days so many of the churches have become Christian country clubs," Key said. "They are more about making you feel good about yourself than making you grow. Some of us, including Harriet, were uncomfortable with all this."

But if Miers is leaving her church, the church is not leaving her. Kaycia Key said she expects to see the next Supreme

Court justice in the pews, singing enthusiastically, if not skillfully. "Let's just say she makes a joyful noise unto the Lord," Key said. "She doesn't hesitate to sing out."

*Pomfret reported from Dallas.*

© 2005 The Washington Post Company

**Advertising Links**                                                                What's this?

**Refinance Rates Hit Record Lows**
Get $150,000 loan for $720 per month. Refinance while rates are low.
www.lowermybills.com

**Save on All Your Calls with Vonage**
When looking for local regional and long distance calling, use Vonage to make calls to all 50 states and Canada. Get voicemail, great international rates and more. Sign up today.
www.vonage.com

**MyCashNow - $100 - $1,500 Overnight**
Payday Loan Cash goes in your account overnight. Very low fees. Fast decisions. Direct deposit is not required. No credit check. Confidential - secure.
www.mycashnow.com

Source: News & Business > News > By Individual Publication > W > The Washington Post
Terms: "harriet miers" and date(geq (10/04/2005) and leq (10/04/2005))  (Edit Search | Suggest Terms for My Search)

✒Select for FOCUS™ or Delivery

☐

*The Washington Post October 4, 2005 Tuesday*

Copyright 2005 The Washington Post

# The Washington Post

## washingtonpost.com

The Washington Post

**October** 4, 2005 Tuesday
Final Edition

**SECTION:** A Section; A01

**LENGTH:** 2165 words

**HEADLINE:** A Deep Dedication to the President, and to Her Work

**BYLINE:** Michael Grunwald, Jo Becker and Amy Goldstein, Washington Post Staff Writers

**BODY:**

As a private citizen in Dallas, **Harriet Miers** was a devoted parishioner and Sunday-school teacher at a conservative evangelical church, and she donated money to an antiabortion group. As a City Council candidate, she opposed the repeal of a law against gay sex. As president of the Texas bar, she led a fight against an abortion rights plank adopted by the American Bar Association. And as President Bush's White House lawyer, she helped vet deeply conservative judges.

But lawyers and others who know Miers in Dallas and Washington say that Bush's latest nominee to the Supreme Court is not a conservative activist. They recall her as a well-regarded corporate litigator, a bridge-building council member, a reform-minded chairman of the Texas lottery, and a dedicated Bush loyalist renowned for her long hours but not hard-right ideology. Her red Mercedes-Benz was such a fixture in the West Wing lot that colleagues called it an abandoned car; she has never married or had children, and some of her friends believe she has sacrificed her personal life for work.

Miers has earned respect across the political spectrum for fairness and especially for diligence. As Bush's staff secretary, she was known to correct spelling, grammar and even punctuation errors in memos to the president. But she has no judicial experience and not much appellate experience. She clerked for a federal district judge more than 30 years ago, and Texas Supreme Court Justice Nathan Hecht says he has dated her "off and on" for decades. But her friends say they have never heard her express any interest in the bench.

"I don't think she ever explored that as a career path," said Elizabeth Lang Miers, her sister-in-law, who is a judge in Texas.

But whatever the holes in her judicial résumé, Miers enjoys the absolute confidence of the president, who once called her "a pit bull in size 6 shoes." In 1988, she donated $1,000 to

05/877
Ex. 6
Mot Recon

then-Sen. Al Gore's campaign for the Democratic presidential nomination, as well as $1,000 to Democratic Sen. Lloyd Bentsen. But ever since she represented Bush in a title dispute over an East Texas fish shack about a dozen years ago, her star has risen with his.

She was the attorney for Bush's gubernatorial transition team in Texas and chaired his state lottery commission. She helped recruit conservative lawyers for Bush during the Florida recount in 2000 and was reportedly assigned during the campaign to conduct a review of his National Guard service. She then moved to Washington as his White House staff secretary, controlling the flow of paper into the Oval Office, and was promoted to deputy chief of staff for policy and then chief counsel. She was a frequent guest at Camp David and helped Bush clear brush at his ranch near Crawford, Tex.

David Frum, a conservative commentator and former White House staffer, wrote on his blog that Miers once told him the president was the most brilliant man she knows. Many colleagues in the White House consider her personal views a bit of a mystery because she has subordinated them to the president's views.

"There's a deep, deep trust that the president has for Harriet," said Jack Howard, a former deputy assistant to the president for legislative affairs. "She is really close in."

Hecht, who first met Miers when she interviewed him for a job in the early 1970s, wields one of the most conservative gavels on the Texas bench. He said he has attended several antiabortion dinners with Miers and noted that she has always tithed to the Valley View Christian Church in Dallas, where antiabortion literature is sometimes distributed and tapes from the conservative group Focus on the Family are sometimes screened. He said her personal beliefs would not guide her jurisprudence, but he scoffed at the skepticism that some conservatives have expressed about Bush's selection of Miers.

"I know what her judicial philosophy will be, and when they find out what this president knows about Harriet, they are going to be happy as clams," Hecht said.

Harriet Ellan Miers grew up in North Dallas, the second youngest of five children. Her mother was a homemaker; her father was in real estate. Her classmates at Hillcrest High School remember the Miers family as especially serious about learning. "I remember that her mother wouldn't even let her watch television," said Sharon Baird, a neighbor and classmate.

Harriet was blond, pretty and athletic -- she captained the tennis team as a senior, and was voted "best all around in sports" -- but she was known as more serious than social. While the cool girls wore bouffant hairdos, she wore a long braid wound modestly around her head. And she was one of the few students outside the in crowd elected to class offices.

"Harry was popular, but popular in a certain way -- very efficient, very dependable, and as sweet as anybody in our class," said Denny Holman, a Dallas real estate developer who was president of the senior class of 1963 while Miers was treasurer.

When Miers was 19, her father suffered a severe stroke and was no longer able to run the family business. An undergraduate at the time at Southern Methodist University, she was about to drop out and take a job at Texas Instruments when her mother persuaded the school to provide financial aid and a campus job in the computer lab. "It was probably the most trying time I can recall," Miers told the Dallas Morning News in 1991. She was a math major with plans to teach, but as she watched a lawyer put the family's finances back together, she said in the interview, she began to realize that lawyers could be a force for good.

When she entered SMU's law school in 1967, Miers was one of eight women in her class. Professor Alan Bromberg remembers her poise, even as she was called on in large lecture classes filled with men; she was also a standout on the law review. "She was never flustered, always very prepared and able to articulate complicated issues intelligently," he said.

After graduating in 1970, Miers clerked for the late U.S. District Judge Joe E. Estes of Texas. She then joined the firm that is now known as Locke Liddell & Sapp, a blue-chip Dallas firm where she would spend the bulk of her career and would become the first female managing partner, named one of the 100 most powerful lawyers in the country. She specialized in commercial litigation, representing big-name clients such as Microsoft and Walt Disney Corp., with a portfolio including antitrust cases and corporate fraud. And she occasionally handled appeals, serving as a counsel of record in 13 such cases since 1989.

For the most part, Miers concentrated on the type of business law that doesn't make headlines. The key to her success was not brilliant oratory that left juries spellbound but meticulous preparation and her ability to earn trust. "She is a very loyal advocate and an astute counselor," said Tom Connop, one of her partners. "She will give a realistic, pragmatic view of the client's case, and I don't think she is afraid to tell a client what they might not want to hear."

In 1989, when Dallas was in the throes of litigation over redistricting, housing desegregation and police shootings, Miers was recruited to run for an at-large seat on the nonpartisan City Council. She won with support from the business establishment and civic leaders. She helped steer the city through its redistricting and desegregation controversies at a time when minority activists were chaining themselves to tables inside City Hall.

"She was an island of calm in a stormy sea," said Rob Allyn, a Republican political consultant in Dallas. "She was the most utterly nonpartisan officeholder I've ever met in my life."

Miers tangled with some of the city's liberal and minority leaders during the redistricting dispute, as well as some white conservatives, and a Morning News article described her reputation among colleagues as "dour, cold, uncompromising and uncommunicative." But the two outspoken African Americans who served on the council at the time, Diane Ragsdale and Al Lipscomb, both recalled her yesterday as tough but fair.

"We had our differences on politics, but she believed in diversity," Ragsdale said.

Lipscomb, who is still influential in the black community at age 80, said Miers knew the law "like a Baptist preacher knows the Bible." He described her as part silk, part steel.

"Look at how meek she looks, like Little Miss Milquetoast, so meek and humble with that ready smile," Lipscomb said. "But if you got in there unprepared, I'm telling you . . ."

Miers did not run for reelection, choosing instead to run for president of the Texas bar. The redistricting had eliminated at-large seats, and Miers had grown weary of the politicking required by elective office. "She doesn't suffer fools all that gladly, and that City Council was a zoo," said Fred Meyer, former chairman of the Texas GOP.

Miers also stepped up her involvement in the American Bar Association, serving on key committees and leading an effort to force a referendum on the association's abortion rights stance. It was a time when many conservatives were quitting the ABA, but Miers chose to fight from within. She was widely respected by lawyers across the political spectrum and was considered a likely future president of the organization. Blake Tartt, a former president of the Texas bar, said Miers believed it was inappropriate for the national association to take any stand on abortion or any other matter of personal conscience.

"She's not a social reformer. She doesn't carry banners," Tartt said. "She believes in the law."

Former ABA president Martha Barnett, a Democrat, asked Miers to chair the organization's Standing Committee on the Federal Judiciary, which used to vet potential nominees. Miers declined, telling Barnett that it wouldn't be right because she planned to take an active role in Bush's 2000 presidential campaign. But their friendship has not wavered, even though they

found themselves on opposite sides during the 2000 Florida recount. And sources said that inside the White House, Miers urged Bush not to disregard the ABA's judicial recommendations, a rare disagreement with the president.

Barnett said Miers is "an idealist, not an ideologue," reflecting the values reflect those of "mainstream America," not the far right.

In recent years, Miers has kept most of her beliefs to herself, but she has clung steadfastly to her commitment to George W. Bush. In 1993, Bush hired her to handle some legal questions for his campaign. After he became governor, she handled his personal legal affairs. He also appointed her to take over the scandal-ridden lottery commission, and she helped push the agency off the front page.

At the White House, Miers is one of the few members of the inner sanctum with ready access to the president. She is known for her extended workdays, sometimes as long as 16 hours. "She's the first in, last out," said Reginald Brown, a former associate White House counsel to Bush. Brown said that within the White House, Miers served as "the custodian of the president's values," making sure policy decisions were in line with Bush's agenda.

In 2003, Miers was promoted from staff secretary to deputy chief of staff, in which she was charged with breaking logjams between agencies. Several former administration officials complain that she was an overly cautious mediator, reluctant to delegate and slow to make decisions. Policy initiatives often stalled in her office, they say.

When Alberto R. Gonzales was named attorney general, Bush tapped Miers to fill his shoes as White House counsel. She has vetted judicial nominees -- including newly installed Chief Justice John G. Roberts Jr. -- and advised the president on issues including the CIA leak investigation and the role of torture in the fight against terrorism.

Hecht said that with her rare spare time in Washington, Miers sometimes goes to the opera with "Condi and the other single girls," referring to Secretary of State Condoleezza Rice. He said he tries to find time to get together with her in Washington to watch a movie or eat at a restaurant. "She's a terrible cook," he said with a laugh.

She is particularly devoted to her mother, who has been an invalid for more than a decade and recently moved into a nursing home. Hecht said Miers has spent much of the money she made in private practice to hire staff members to care for her mother; she lives in a modest condominium in Arlington.

No matter what she does, friends say, Miers relies on her faith. The Rev. Barry McCarty, pastor at Valley View, described her as a born-again Christian who was baptized as an adult. When she has returned to Valley View, she has often greeted well-wishers before and after services and has asked them to pray for her and the president.

Staff writers Jeffrey H. Birnbaum, John Pomfret, Dale Russakoff and R. Jeffrey Smith and researcher Julie Tate contributed to this report.

**LOAD-DATE:** October 4, 2005

Source:   News & Business > News > By Individual Publication > W > **The Washington Post**
Terms:   **"harriet miers" and date(geq (10/04/2005) and leq (10/04/2005))**  (Edit Search | Suggest Terms for My Search)
View:   Full
Date/Time:   Thursday, October 6, 2005 - 1:56 PM EDT





HOME > COMMITTEE
INFORMATION >                **RULES OF PROCEDURE**

# Rules of Procedure
### UNITED STATES SENATE COMMITTEE ON THE JUDICIARY

## I. MEETINGS OF THE COMMITTEE

1. Meetings of the Committee may be called by the Chairman as he may deem necessary on three days' notice of the date, time, place and subject matter of the meeting, or in the alternative with the consent of the Ranking Minority Member, or pursuant to the provision of the Standing Rules of the Senate, as amended.

2. Unless otherwise called pursuant to (1) of this section, Committee meetings shall take place promptly at 9:30 AM each Thursday the Senate is in session.

3. At the request of any Member, or by action of the Chairman, a bill, matter, or nomination on the agenda of the Committee may be held over until the next meeting of the Committee or for one week, whichever occurs later.

## II. HEARINGS OF THE COMMITTEE

1. The Committee shall provide a public announcement of the date, time, place and subject matter of any hearing to be conducted by the Committee or any Subcommittee at least seven calendar days prior to the commencement of that hearing, unless the Chairman with the consent of the Ranking Minority Member determines that good cause exists to begin such hearing at an earlier date. Witnesses shall provide a written statement of their testimony and curriculum vitae to the Committee at least 24 hours preceding the hearing in as many copies as the Chairman of the Committee or Subcommittee prescribes.

2. In the event 14 calendar days' notice of a hearing has been made, any witness appearing before the Committee, including any witness representing a Government agency, must file with the Committee at least 48 hours preceding her appearance a written statement of her testimony and curriculum vitae in as many copies as the Chairman of the Committee or Subcommittee prescribes. In the event the witness fails to file a written statement in accordance with this rule, the Chairman may permit the witness to testify, or deny the witness the privilege of testifying before the Committee,

*Not Moon*
*Ex. H*
*051877*

or permit the witness to testify in response to questions from Senators without the benefit of giving an opening statement.

## III. QUORUMS

1. One-third of the membership of the Committee, actually present, shall constitute a quorum for the purpose of discussing business. Eight members of the Committee, including at least two members of the minority, must be present to transact business. No bill, matter, or nomination shall be ordered reported from the Committee, however, unless a majority of the Committee is actually present at the time such action is taken and a majority of those present support the action taken.

2. For the purpose of taking sworn testimony, a quorum of the Committee and each Subcommittee thereof, now or hereafter appointed, shall consist of one Senator.

## IV. BRINGING A MATTER TO A VOTE

1. The Chairman shall entertain a non-debatable motion to bring a matter before the Committee to a vote. If there is objection to bring the matter to a vote without further debate, a roll call vote of the Committee shall be taken, and debate shall be terminated if the motion to bring the matter to a vote without further debate passes with ten votes in the affirmative, one of which must be cast by the minority.

## V. AMENDMENTS

1. Provided at least seven calendar days' notice of the agenda is given, and the text of the proposed bill or resolution has been made available at least seven calendar days in advance, it shall not be in order for the Committee to consider any amendment in the first degree proposed to any measure under consideration by the Committee unless such amendment has been delivered to the office of the Committee and circulated via e-mail to each of the offices by at least 5:00 PM the day prior to the scheduled start of the meeting.

2. It shall be in order, without prior notice, for a Member to offer a motion to strike a single section of any bill, resolution, or amendment under consideration.

3. The time limit imposed on the filing of amendments shall apply to no more than three bills identified by the Chairman and included on the Committee's legislative agenda.

4. This section of the rule may be waived by agreement of the Chairman and the Ranking Minority Member.

## VI. PROXY VOTING

1. When a recorded vote is taken in the Committee on any bill, resolution, amendment, or any other question, a quorum being present, a Member who is unable to attend the meeting may submit her vote by proxy, in writing or by telephone, or through personal instructions. A proxy must be specific with respect to the matters it addresses and may not be counted either in reporting a matter, bill, or nomination to the floor, or in preventing any of the same from being reported to the floor.

## VII. SUBCOMMITTEES

1. Any Member of the Committee may sit with any Subcommittee during its hearings or any other meeting, but shall not have the authority to vote on any matter before the Subcommittee unless she is a Member of such Subcommittee.

2. Subcommittees shall be considered de novo whenever there is a change in the Subcommittee chairmanship and seniority on the particular Subcommittee shall not necessarily apply.

3. Except for matters retained at the full Committee, matters shall be referred to the appropriate Subcommittee or Subcommittees by the Chairman, except as agreed by a majority vote of the Committee or by the agreement of the Chairman and the Ranking Minority Member.

4. Provided all Members of the Subcommittee consent, a bill or other matter may be polled out of the Subcommittee. In order to be polled out of a Subcommittee, a majority of the Members of the Subcommittee who vote, must vote in favor of reporting the bill or matter to the Committee.

## VIII. ATTENDANCE RULES

1. Official attendance at all Committee markups and executive sessions of the Committee shall be kept by the Committee Clerk. Official attendance at all Subcommittee markups and executive sessions shall be kept by the Subcommittee Clerk.

2. Official attendance at all hearings shall be kept, provided that Senators are notified by the Committee Chairman and Ranking Minority Member, in the case of Committee hearings, and by the Subcommittee Chairman and Ranking Minority Member, in the case of Subcommittee hearings, 48 hours in advance of the hearing that attendance will be taken; otherwise, no attendance will be taken. Attendance at all hearings is encouraged.

CLERK'S OFFICE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
U.S. COURTHOUSE
333 CONSTITUTION AVENUE, N.W.
WASHINGTON, DC 20001

EX I
051877

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Betty Ann Newby
vs.
President George Bush, et al

Civil Action No. 05-1877
UNA

Memorandum of Law in
Support of Plaintiff's
Motion for Reconsideration
and for an Altered or
Amended Order

To the Honorable Judge Huvelle:

Plaintiff files her Memorandum of Law in
support of her above-described motion
and shows the court as follows:

1. The court committed prejudicial error in
finding that all Senator defendants were immune
from equitable and injunctive relief, a suit
such as this, arising from the performance
of their official duties. The error resulted in
the denial of a fair and final order on the merits.

## Facts

Plaintiff, formerly a Texas resident, moved to
Washington, DC. As a D.C. resident she has no
voter-constituent status because she has no
official representatives in Congress to allow her
to vote indirectly on matters such as the sole
confirmation of the federal judicial officers.
She attempted to visit with several Senators
regarding Roberts' nomination and his role
in approving illegal surveillance operations at
home and abroad while he worked for Ronald Reagan
and George H. Bush as a Justice Department lawyer.
A federal employee had told plaintiff that government
lawyers had approved Home Guard Securities Operation
and classification of plaintiff by the executive
order in 1990, although she was and is not a
terrorist and poses no national security risk.
She wanted to know John Roberts' involvement in
approving such illegal activity by the executive

①

branch. She is unable to obtain discovery or compel testimony from Judge Roberts pursuant to the Senate Judiciary Rules of Procedure (See attached Exhibit __H__ ). She was also unable, as a voter without a Senator, to compel the Senate Judiciary Committee to compel production of Roberts' papers from the executive office or to compel him to answer candidly questions asked by the Senators during Roberts' Senate hearing pursuant to 28 USC 1365. She was unable to have the Senate Judiciary Committee members or other representatives challenge President Bush's narrow interpretation of executive and deliberative privilege or his using Executive Order No. 13233 to amend the Presidential Papers Act of 1975 and greatly expand the scope of executive privilege to cover his father's papers from 1980-1992.

A government contractor for the CIA told me that from 1991-1995 he had posed as an appliance repairman in Iraq. He and other such contractors installed over 10,000 surveillance devices in ovens, microwaves, radios, etc throughout the Middle East. He told me the covert surveillance was George H. Bush's idea and was supported by lawyers that advised him. Ten thousand or so interpretors told the Americans what Sadaam Husein's wife's grocery list included, his mistresses' names and addresses, his sons' businesses, what weapons he had and what he did not have, what weapons he wanted but could not obtain. The operation cost over $8,000,000.

The public and the plaintiff have a great interest in knowing how government operates

and who to believe about foreign and
domestic policies that affect the
people and their lives.

Black bag operations by the F.B.I. in the
Viet Nam protest period were declared to
be illegal. Mark Felt was charged with
ordering some of these surveilance
burglaries but according to the Post.
The public knew that burglaries such as
Watergate and illegal surveillance of
political adversaries caused President
Nixon to be impeached and to leave office.

Plaintiff had no remedy but to file a
suit to seek judicial review of the
expanded executive privilege and to
learn John Roberts' role in Homeguard
and Iraqi surveillance operations to
provide to the public and to the Senate.
She and they have a right to know the
character of federal judicial officers
and the administrations that sponsor them.

Section 5
Chapter 5 § 702 of the Administrative procedures
Act gives the federal district court jurisdiction
to enter injunctive and declaratory relief to
litigants whose rights are affected by the
agency's actions. See, Joshuard v. Carter, Atorne En
Or Chapter 28 USC § 1346(b) gives the federal district
court jurisdiction over negligence actions
committed by federal actors acting in scope of
their employment. It allows money damages.
Plaintiff contends that the Senators on the Judiciary
Committee were negligent in conducting the John
Roberts confirmation hearings. They breached their
duties to investigate thoroughly the nomination
for Chief Justice of the Supreme Court, John Roberts.
Their lax investigation did not challenge President
Bush's executive and deliberative privilege
claims, did not compel production of Roberts

documents from 1980-1992, and could not
compel his testimony to questions asked.
The breach of their duty led to Roberts'
confirmation without obtaining documents
to determine whether or not he had advised
Presidents Reagan and Bush and Defense
Secretary Dick Cheney and others that
covert surveillance was legal even when
there was no national defense or security
issue. I have been damaged because the
Senator-defendants did not pursue their
investigative powers and judicial review
pursuant to 28 USC 1365.

Further, the 1st and 5th Amendments allow
me access to the Courts to determine
my Due Process and associational-travel
rights pursuant to 28 USC 1331 (federal
question) because my challenge to the
Senate Committee arises as a D.C. resident
with no Senator to represent my interests.

A first impression argument is that the
case involves voter rights of D.C.
residents for Congressional representatives,
as D.C. residents have no rights to vote
as do citizens of the 50 states. The District
population is smaller than the largest states,
but larger than states like Dick Cheney's state
of Wyoming. District youth are killed and
maimed in the present war — yet they
are not allowed to vote for Congressional
representatives while fighting for "democratic"
values in Iraq and Afghanistan. Therefore,
28 USC § 1343(4) applies to grant jurisdiction
to hear cases against Senators involving voter
rights and civil rights waives immunity of
legislators.

    Further, the three cases cited by the

court in its Order of September 2, 2005,
state that legislators cannot claim
immunity if the litigation involves
misfeasance, illegal conduct, or conduct
not in furtherance of legislative business.
Additionally, if the conduct of the majority
members of the Judiciary Committee
was intentional to cover-up government
misconduct such as wide-scale covert
surveillance, trespass, destruction of property,
and ruining people's lives for political reasons,
then plaintiff may sue the Senators
directly under the Constitution as
federal actors committing intentional
torts under Bivens-type suits. Again,
the District Court has jurisdiction because
of its Article III power and federal question
jurisdiction.

   The courts have also allowed parties to sue
federal officers and employees individually,
if their actions were ultra vires or illegal.
In these exceptional cases, money damages
are allowed and there is no governmental
absolute immunity and the government is
not required to pay the damages.
See,



Because plaintiff is entitled to federal court
jurisdiction as described above, the courts
finding that she was not entitled to relief
for any reason against the Senators because of
their legislative immunity is incorrect and
presents reversible error that has
prejudiced plaintiff requiring vacatur.

2. The court erred prejudicially in shifting the burden of proof to the plaintiff rather than require the defendants to present competent, material, relevant evidence why plaintiff's case should not be dismissed for failing to state a claim upon which relief can be granted ~~and sug sponte~~ without notice and summarily.

The courts have not approved a heightened scrutiny rule for litigants seeking redress from governmental agents. See,

The courts shifting the burden of proof without notice and opportunity to amend pursuant to Rule 15, FRCP, (See, Foman v. Davis and to present evidence is disfavored by the courts on Du Process grounds. See, Mathew v. Eldridge, ___ U.S. ___ (1976)

(hearings conducted in meaningful time and manner)

The better and fairer procedure for the court acting sug sponte is to enter a show cause order ~~requiring~~ the plaintiff to amend pleadings, if necessary and present evidence in support of her pleadings before summarily dismissing the ~~sux~~ case.

Of course, Rule 12b(6) allows a defendant as a plea in bar to challenge the plaintiff's pleadings on factual and legal grounds.

Justice does not have to work quickly to accomplish needs of all litigants and the courts. It would be better served without hasty, summary decisions.

©

3. # While the prisoners-cases in forma pauperis and pro-se present different policy considerations because of the nature of the claims and the potential for sheer volume, this case can be distinguished because Betty Ann Newby is pro se because she is unable to pay for an attorney and is indigent because the federal government's agents, as a political favor, have destroyed her properties and have ruined her financially because she objected to intentional and illegal conduct by Texas petro-chemical giants whose hazardous chemical operations forced an entire Texas town to relocate on for $5,000,000 when the residents spent approximately $100,000,000 to move.

Plaintiff contends that 28 USC 1915 applies only to prisoners suits and that her indigency status is rooted in the 5th Amendment and Due Process. Alternatively, she argues that if the ~~constitutionality of applying this statute to non-prisoner suits~~ prevails, ~~the~~ statute is determined to apply to all indigency, pro·se suits, that she is denied 1st, ~~5th, and~~ and 5th Amendment rights as a non-prisoner ~~indigent~~ person with limited funds seeking redress in federal court for civil rights violations.

4. The court created prejudicial error in failing to state findings of fact and conclusions of law in the Order denying a temporary restraining order (src) — because Rules 65 and 52, FRCP require it for an effective appeal to be prosecuted.

⑦

6. Plaintiff would be able to prosecute her appeal more effectively if the Court enters separate orders for separate motions for purposes of appeal. A party is prejudiced if part of an order is reversible and another part is not if a court combines the decision in one document. See Rule 54, FRCP.

7. Pursuant to Rule 65, to obtain a temporary injunction, a plaintiff is required to prove she is threatened imminently by a wrong committed by a defendant, that she will suffer greater hardship than the defendant if the injunction is not entered, that she has clean hands, that Justice favors the granting of the injunction, that a likelihood exists that she will prevail on the merits, and that she is willing to post a bond to secure the injunction.

   Plaintiff adopts the ~~answers~~ facts asserted in #1 and refers the court to pp ___4-8___ of the complaint and to pp ___1-8___ of the Motion for an injunction. She has no adequate remedy at law. ~~Since the court~~ Because

The Court abused her discretion in refusing to enter a temporary injunction to enjoin the Roberts' confirmation hearing until plaintiff's Constitutional challenge to executive and deliberative privilege and compelling of Roberts' testimony was resolved. Plaintiff had established evidence supporting her request of government

wrong-doing) probably by John Roberts, President Bush (George W and George H), Vice-President Cheney, and President Reagan in many, mass covert surveillance of thousands of unsuspecting persons. The threat to plaintiff was and is imminent. Plaintiff has a very real interest in judicial appointments because of her own situation as a victim of illegal government surveillance. Since the court's September 22 order, agents for the Home Guard security have caused more of plaintiff's property to be destroyed and are threatening her staying at the federally-funded shelter in D.C. This important motion is not typed because plaintiff's typewriter, legal papers, and notes were stolen a few days ago at the request of agents for Home Guard Security.

The Court's failing to enter an injunction have caused plaintiff to have serious doubts about the future of the courts in America and to dilute her belief in judicial review. There are almost no checks and balances on the judiciary and private litigants with important constitutional claims are dealt with in summary fashion — especially ones with few funds.

As shown below, plaintiff's likelihood of success on the merits, combined with facts supporting the injunction, mandate this Court's vacating its Order and reinstating the case to the docket.

Plaintiff has raised first impression Constitutional claims and issues that deserve hearing, evidence, and a decision based on well-developed litigation.

(9)

7. As shown by the facts stated in plaintiff's complaint and motion, Phillips lawyers bragged to her in 1993-1994 that its Dallas lawyers (Loche-Purnell-Rain-Hanrell, P.C.) now named Loche-Liddell-Sapp, LLP, controlled the courts. They told her that their firm used Justices Nathan Hecht and Priscilla Owen on the Supreme Court, Justices Edith Jones, Rhesa Barksdale, and Patrick Higginbotham on the 5th Circuit; and Justice Scalia on the U.S. Supreme Court to win their cases. They told me that these judges controlled the courts where the major campaign contributors litigated. In 1996, a Phillips contractor told me that it (Phillips) was planning to have the City of Borger bulldoze my properties and that George Whittenburg, III, esq. and the Dallas lawyers and Justice Hecht were going to have me disbarred as an example and to punish me for suing them so many times.

The Whittenburg firm and the Loche-Purnell firm have plaques in the State Bar of Texas Building honoring their contributions. Nathan Hecht originally practiced with a predecessor firm. The Loche-Purnell firm loaned Justice Hecht an office and gave him campaign money to run for judge. He contributed and vice-versa to the campaign funds of Justice Priscilla Owen and as did Harriet Miers.

In the late-mid 1990's, Mike Powell, a to another Loche-Purnell lawyer, Broadus Spivey and Jody Sheets convinced the Texas Supreme Court to change the river boundary of the Canadian

River north of the former town of Phillips, Texas, north of Phillips facilities, and give title to Teel Bivins and the Whittenburg heirs, including the royalties in the River Bed from oil wells. The court divested the State of Texas of a valuable river bed, took the oil royalties away from the Permanent School Fund, and gave them to Bivins and Whittenburgs as a favor to Phillips and its lawyer, Locke-Purnell-Rain Harrell, P.C.

The put Phillips later convinced Hutchinson County, Texas Commissioners to cancel the dedication of public roads over Thes river bed and close all public roads. Thus, effectively, kept Plaintiff from taking samples to prove Cercla violations in a navigable river in the Canadian River. Subsequently, President Bush named Teel Bivins as Ambassador to Sweden as a favor for Bivins' raising so much political money for President Bush.

In the early 1990's, Harriett Miers was compelled to testify in a lottery whistle blower suit that G-Tech Corp. had prevailed in obtaining the no-bid contract and had quickly made $89 million dollars. Richard Rainwater owned G-Tech. He, of course, owned the Texas Rangers and made President Bush a multi-millionaire.

Plaintiff learned that President Bush had appointed Miers to the Supreme Court when it was announced earlier this week. The continued Home Guard Surveillence of me in D.C. and intimidation and destruction of my properties is to keep me from trying to influence any Senators in their vote out of fear. Harriet Miers was President of Locke-Purnell while I was litigating the Phillips case in Amarillo.

... The litigation and appeal include pleadings and proof that Phillips' retained counsel and in-house counsel had intentionally destroyed protected court records involving environmental cl claims, had suborned perjury, bribed Judge Robinson by sending her husband-lawyer large referral fees, and had tampered with 5th Circuit Justices Higgenbotham, Jones, and Barksdale.

The public should know the truth about the "blue chip" firm Harriet Miers advertised. The Austin Statesman reported the lottery story. See Exhibits F and 9. More than ever, plaintiff needs equitable relief and protective orders. Her life and liberty are more in danger here than in Texas.

8. The court's error in dismissing the case on the pleadings summarily and sua sponte is the functional equivalent of requiring heightened scrutiny for plaintiff claims for wrongs by federal agents and officers and employees. The Supreme Court rejected this pleading scrutiny. Therefore, the Order should be reviewed to provide plaintiff procedural safeguards as allowed by a show cause order or a Rule 12b(6) motion by the defendants.

9. Plaintiff contends that perhaps the court did not actually apprehend the facts and applied incorrect legal principles to the facts of this case. The facts,

at first blush, appear overwhelming. However, as shown by the Declaration of Betty Ann Newby in support of this motion, all facts stated in this Memorandum, motion, and previously-filed complaint and motion are true and based on personal knowledge, unless otherwise stated; made under the pain and penalties of perjury.

Plaintiff asks for reinstatement so she can present her evidence and amended pleadings in a timely and reasonable manner. Justice will be served if the court

#. will reconsider the order, vacate it, and reinstate the case on her docket. Manifest injustice will be the result otherwise. See Rule 65, FRCP

10. alternatively, the court should recuse herself because of a semblance of impropriety, created by the summary treatment, the fact that President George H. Bush originally appointed her to the Superior Court in D.C., and the fact that the clerk did not mail a copy of the order to plaintiff and 4 days later, plaintiff picked it up at courthouse. The envelope without an address is attached as Exhibit I.
See, Liljeberg, Marshall v. Jerrico, 5th Amend; 144, 455 28 USC

11. The court erred in determining that the complaint made no claims against President Bush or John Roberts. Plaintiff respectfully would ask the court to assign the presumption of truthfulness to her facts in determining this threshhold issue.
Betty Ann Newby contends that Executive Order No. 13,233 entered by President Bush

in November 42001 is void because it
attempts to amend the Presidential Papers
Act of 1974, a function exclusively in the
realm of Congress. The separation of
powers - Supremacy Clause Constitutionally
empowers Congress to write law and the
executive to execute it and the
judiciary to interpret the law.

The president has breached his oath of
office to uphold the Constitution both by
making law and also attempting to
tell the judiciary who has judicial
review of the Executive Order.
See, U.S. v. Nixon ____ US ___ (1974)

He has breached his oath of office by
engaging in covert, political surveillance
unrelated to national security.
~~That~~ His participation in Homeguard
Security has resulted in the destruction
and Theft of plaintiffs home, car, historic
properties, and their late brothers home in Boron,
Texas. It has caused plaintiff great suffering.
His actions in this regard are ultra vires
and illegal.

Therefore, plaintiff may seek redress in federal
district court against the President on these
grounds:

① 28 USC 1331
② 28 USC 1346(b)
③ Bivens action directly on the Constitution
   for intentional torts
④ little tucker Act  violations 28 USC 1346 (b)(2)

⑤ Contract Clause of the Constitution
⑥ 28 USC 1343(4) voting rights and civil rights
— ⑦ ultra vires acts — case authorities
   ⑭ Cf. ~~Nixon~~ Fitzgerald v. Nixon

John Roberts may be sued for damages and equitable and declaratory relief on grounds similar to President Bush. He is not entitled to exert privilege or immunity because plaintiff is alleging government misconduct by him as well as by President Booth as a reason to engage in meaningful discovery before confirmation and in connection with plaintiff's claims for covert, illegal surveillance and destruction of her properties by federal agents.

The avenues of jurisdiction for suit are similar as for President Bush. He nor President Bush are immune from declaratory or equitable relief or damages.

Plaintiff adopts the authorities in # 10 <u>supra</u>.


12. The Courts, especially, District of Columbia, have used a balancing test in deciding discovery questions regarding privilege by government parties. If a government misconduct is suggested, the balancing disappears and discovery is allowed, subject to safeguards by the Court such as in camera inspection of documents such as used in <u>US v Nixon</u>. Plaintiff contends that President Bush

has violated the Separation of Powers Doctrine
and his narrow interpretation of the
Presidential Papers Act has resulted in an
"iron curtain" of secrecy for American
citizens who have a right to know that
they live in a democracy, not in a
Corporate oligarchy.

Executive Order 13233 is unConstitutional
and void — a first impression case
because in this case plaintiff is
interested in Homeguard Security
documents and its participants
(a narrow category) to its use
in evaluating Supreme Court justices
and in litigating her claims.

14. Plaintiff asks the Court to re-read all of the
pleadings in this case and to take judicial
notice that the FBI. Black Bag jobs are
illegal and have been for 30 years—
Burglary to obtain information is also
illegal, and destruction of another's
property is conversion and a Constitutional
Taking if done by government actors.
She asks the Court to construe the
facts in plaintiff's favor and to construe
them as favoring plaintiff's claims.
She asks the Court for injunctive and
declaratory relief because her life and
liberty and property are threatened more
each day in D.C.
She asks for a declaration That the USA
patriot act as applied to her surveillance is
unConstitutional.

15. Plaintiff contends that President
Bush has a duty, pursuant to The
Presidential Papers Act, to produce Roberts'
papers. The public is entitled to see
papers 12 years after President leaves
office. The Act does not extend to
Vice-Presidents and President's
executive orders cannot
override or veto Congress.
    Separation of Powers — Supremacy Clause
President Bush has violated his oath
of office to uphold The Constitution and
in failing to do so has breached The
Contract Clause. Therefore, The Court
has jurisdiction to entertain this
action  28 USC 1346 (a)(2).


16. The Federal Tort Claims Act Notice
Requirement does not serve good public
policy in cases such as this. While
attempting to provide a waiver of sovereign
immunity for torts by federal employees in
the scope of their employment, it is a roadblock
to need for immediate equitable and
declaratory relief. It is therefore, unconstitutionally
too restrictive for one relying upon the statute for
federal jurisdiction.

17. Application of 28 USC 1915 to non-prisoners who are poor, disserves the purpose of the statute to control excessive prison-related suits that might clog the courts.

Due Process takes a holiday if it is applied to this case. The Rule 15, FRCP, amendment provision is to be liberally construed. The pleading rules are designed to give notice pleading. Rule 12 allows defendants opportunity to challenge litigation before the expenses mount.

The public belief in the courts and democratic values of fundamental fairness outweigh the district court's screening of cases on the fast track without adequate procedural safeguards promised, originally by the Magna Carta. Plaintiff is denied privileges and immunities and federal due process if the federal court is allowed to dismiss this important public interest test without hearing, argument, discovery, briefing, and a jury trial.

18. Plaintiff asserts that the Court misperceived her claims and the relief requested when it so hastily concluded it had and would never have jurisdiction. Plaintiff wanted a hearing to flesh out their allegations, issues, and the facts.

(18)

The Court may still conduct a timely hearing after it reinstates the case to the docket and enters further orders in the interest of justice pursuant to applicable legal principles, tempered with equity.

Respectfully submitted,

Betty Newby
425 2d St NW
DC 20001